UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

NOT FOR PUBLICATION

---

FARIZ ALIEV,

                              Plaintiff,

          – against –

NERIYA BORUKHOV, ARON BORUKHOV,
Individually and in his Capacity as Attorney and
Principal of the Law Firm of ARON B.
BORUKHOV & ASSOCIATES, P.C., ROSHEL
MALAKOV, STELLA AKBASHEV, ARON B.
BORUKHOV & ASSOCIATES, P.C.,
SKYHIGH EQUITIES, LLC, 175-31 JAMAICA,
LLC, 41-21 REALTY, INC., VIRGIN CAPITAL,
LLC, 31 SUMPTER, LLC, ROMAL EQUITIES,
LLC, 84-19 KENT ST. REALTY LLC,

                              Defendants.

---

**MEMORANDUM & ORDER**

15-CV-6113 (ERK) (JO)

KORMAN, *J.*:

On October 26, 2015, plaintiff Fariz Aliev ("Aliev") filed a complaint principally seeking damages against Neriya Borukhov, his brother Aron Borukhov, and two other individuals, Stella Akbashev ("Akbashev"), and Roshel Malakov ("Malakov"), as well as against a number of related entities, including Aron Borukhov's eponymous law firm, Aron B. Borukhov & Associates, P.C. (together, "the Defendants"). The complaint asserted that the Defendants had violated the Racketeer Influenced and Corrupt Organizations statute by defrauding Aliev into investing in several real estate transactions over a multiyear period and then ultimately taking his funds for their own purposes without providing him anything in return. The complaint also alleged a number of state-law claims, including common-law fraud. Three sub-groups of the Defendants have each separately moved pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss the complaint.

## FACTS

Aliev, a resident of Queens, New York, met Aron and Neriya Borukhov in 2011 when they successfully brokered Aliev's purchase of a property in Queens. Am. Compl. ¶¶ 1, 19. Aron Borukhov, Neriya's brother, is an attorney licensed to practice in New York and the principal of Aron B. Borukhov & Associates, P.C. *Id.* ¶¶ 11, 104. After the first transaction, the Borukhovs offered Aliev the chance to make more real estate investments through them.[1] *Id.* ¶ 20.

### I. 175-31 Jamaica Avenue Transaction.

On or around September 13, 2013, Aliev met with Neriya and Aron Borukhov at the latter's law offices. *Id.* ¶ 24. At that meeting, Aliev was offered the right to purchase a building at 175-31 Jamaica Avenue in Queens for $700,000. *Id.* ¶ 25. The Borukhovs purportedly directed Aliev to make out his payment to "Aron B. Borukhov, Attorney at Law," and informed him that the money would be deposited into Aron Borukhov's attorney trust account. *Id.* ¶ 26. Aliev believed that the money would be held in escrow until closing. *Id.* He paid with two certified checks, a $400,000 check issued on November 20, 2013, and a $300,000 check issued on December 2, 2013. *Id.* ¶¶ 27–28. On December 16, 2013, Aliev again met with the two Borukhovs, who advised him that the owner of the property had raised the price by $200,000. *Id.* ¶ 29. Aliev declined to pay the extra sum and requested that his money be returned. *Id.* ¶ 30. The Borukhovs then suggested that the money remain in escrow to be used instead to purchase a different property at 64-44 Dieterle Crescent in Queens, *id.* ¶ 31, which, as discussed below, they had previously brought to Aliev's attention. Aliev does not specifically allege whether he assented to this change in plans.

---

[1] According to the motion to dismiss filed by the set of Defendants that includes Neriya Borukhov (the "Neriya Borukhov Defendants"), the nature of the investments was that Neriya would identify distressed mortgages, which he would purchase from the mortgagee. He would then negotiate a purchase of the property at a lower price in lieu of foreclosing on it. After he owned both the mortgage and the property, he would then sell the property at a profit. Aliev's participation, according to Neriya, was "to advance the funding for the purchases of these mortgages and/or fee interests." *See* Neriya Borukhov Defs.' Mem. 3.

According to Aliev, a search of the property records shows that the Borukhovs had actually purchased the promissory note on the Jamaica Avenue property in September 2011 and had transferred it to a wholly owned entity called 41-21 Realty, LLC. *Id.* ¶ 35. They had also previously acquired the deed to the property from the homeowner and had transferred it to another wholly owned entity called Skyhigh Realty, LLC. *Id.* ¶ 36. On or about August 14, 2014, the Borukhovs allegedly transferred the deed from Skyhigh to the defendant Malakov[2] through an entity called Romal Equities, LLC. *Id.* ¶ 37. They did not record the deed until May 26, 2015. *Id.* ¶¶ 38–39. Also on or about August 14, 2014, Malakov allegedly transferred the deed to an entity called 175-31 Jamaica Ave LLC, owned by the Borukhovs, in exchange for $650,000. *Id.* ¶ 40. The Defendants did not record the deed reflecting this transfer until September 3, 2015, more than a year later. *Id.* ¶¶ 41–42. The Defendants purportedly recorded the two deeds by mail. *Id.* ¶ 49. On September 1, 2015, Neriya Borukhov applied for a permit "as owner of the property" to engage in construction at 175-31 Jamaica Avenue. *Id.* ¶ 44. The Jamaica Avenue property is the only one with which Aliev alleges the defendant Malakov had any involvement.

II.    64-44 Dieterle Crescent Transaction.

On or about November 6, 2012, almost a year prior to the Jamaica Avenue transaction, Aliev met with the Borukhovs at Aron Borukhov's law offices. *Id.* ¶ 56. The Borukhovs then informed Aliev about a property at 64-44 Dieterle Crescent. They suggested that the property would be available for between $800,000 and $850,000. *Id.* ¶ 57. According to Aliev, the Borukhovs advised him that time was of the essence because the property was facing foreclosure. *Id.* ¶ 58. Aliev expressed interest and was told that he "must deposit a sum of $200,000 with JPMorgan Chase as a show of good faith to the bank of his intent to close on the transaction." *Id.*

_____

[2] In his opposition to the motions to dismiss, Aliev asserts that Malakov is Aron Borukhov's father-in-law. Pl.'s Opp'n 3.

¶ 59. JPMorgan was to serve as the escrow agent. *Id.* ¶ 60. Aliev alleges that, on November 23, 2012, he mailed JPMorgan a certified check in the amount of $200,000. *Id.* ¶¶ 61, 70.

Almost three years later, on or around June 9, 2015, Aron Borukhov met with Aliev and informed him that the funds for the closing of 64-44 Dieterle Crescent—presumably referring to some combination of the $700,000 Aliev had paid for the Jamaica Avenue property and the $200,000 paid to JPMorgan in 2012—were unavailable for closing, offering no explanation for the absence of the money. *Id.* ¶¶ 32–33. Shortly thereafter, on June 24, 2015, Aliev attended the closing for the property, where Neriya Borukhov informed him that the $200,000 paid in 2012 was his "finder's fee" and would not go toward the purchase price.[3] *Id.* ¶ 64.

Aliev alleges—again based on his search of the property records—that, on November 28, 2012, JPMorgan had applied the $200,000 Aliev paid to an outstanding mortgage on another property, 84-19 Kent Street in Queens. *Id.* ¶¶ 65, 67. Also on November 28, 2012, defendant Stella Akbashev, Neriya Borukhov's wife, allegedly took ownership of the 84-19 Kent Street property through an entity called 84-19 Kent St Realty, LLC. *Id.* ¶¶ 68, 69. This transaction is the only one in which Aliev alleges Akbashev had any involvement.

III.    366 Bainbridge Street Transaction.

On or around May 25, 2013, Neriya and Aron Borukhov met with Aliev and informed him of the opportunity to purchase a property at 366 Bainbridge Street in Brooklyn. *Id.* ¶¶ 87–88. Aliev was told that, in order to purchase the property, he would have to pay $320,000 to an entity called Clearview Funding, which allegedly held the note and mortgage attached to the property. *Id.* ¶ 89. Aliev made the payment with two wires, the first for $250,000 on May 30, 2013, and the

---

[3] Confusingly, Aliev states in his opposition to the Defendants' motions to dismiss that the Dieterle Crescent transaction "was not fraudulent." Pl.'s Opp'n 7. Indeed, he states, "Plaintiff intended to legitimately purchase the property for his personal use as primary residence, which he eventually did . . . ." *Id.* Presumably, what Aliev means to say is that he subsequently paid for the property in full and was defrauded of the $900,000 he had initially paid toward it.

second for an additional $70,000 on May 31, 2013. *Id.* ¶ 90. Aliev alleges that he has not received the deed to the property, *id.* ¶ 91, and that, at some point, Aron and Neriya Borukhov purchased the note and mortgage through an entity called Virgin Capital, LLC, *id.* ¶ 92.

IV.    31 Sumpter Street Transaction.

On June 3, 2015, just days before Aliev discovered that the Borukhovs had allegedly taken the money he had paid for the Jamaica Avenue and Dieterle Crescent properties, Neriya Borukhov contacted Aliev via telephone to advise him of the opportunity to purchase a house located at 31 Sumpter Street in Brooklyn. *Id.* ¶ 73. That same day, Aliev received an email from Aron Borukhov that outlined the terms of a proposed partnership to purchase the Sumpter Street property. *Id.* ¶ 74. Aron Borukhov requested $92,500 as a down payment for the property, which was to be purchased for $925,000. *Id.* ¶ 75. The next day, Aliev met with Aron Borukhov, who told him that the money needed to be made available immediately. *Id.* ¶ 76. Aliev paid him $92,500, but never received any other information regarding the transaction. *Id.* ¶¶ 77, 79. Aliev alleges, from his review of the property records, that Neriya Borukhov purchased the property through an entity called 31 Sumpter, LLC on August 17, 2015 for $905,000. *Id.* ¶ 80.

V.    1016 Greene Avenue Transaction.

In May 2015, Neriya Borukhov purportedly informed Aliev of the opportunity to purchase a distressed property located at 1016 Greene Avenue in Brooklyn for $357,000. *Id.* ¶ 97. On May 4, 2015, Aliev executed a contract to purchase the property through an entity called 1016 Green LLC. *Id.* ¶ 100. On May 22, 2015, the title company recorded a deed showing 1016 Green LLC as the owner of the property, but failing to note that Aliev owned 1016 Green LLC. *Id.* ¶ 101. Having discovered the fraudulent scheme around this time,[4] Aliev allegedly retained an attorney

---

[4] The timing of events presented in the complaint is somewhat confusing. Aliev alleges that the injunction was entered on June 4, 2015. Am. Compl. ¶ 103. But the state-court order itself indicates that the application was made on June 2, 2015. Hallock Decl., Exh. J. As noted above, the complaint specifies that

and moved for an injunction against the Defendants "transferring the property or using said property as collateral for a mortgage." *Id.* ¶ 102. The injunction was purportedly granted on June 4, 2015. *Id.* ¶ 103. On June 18, 2015, the title company recorded a corrected deed. *Id.* ¶ 104.

## ANALYSIS

### I.     Standard of Review.

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In *Iqbal*, the Supreme Court advanced a two-pronged approach to considering a motion to dismiss. First, a court can "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679. The Court explained that, "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.*; *see also id.* at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679; *see also Goldstein v. Pataki*, 516 F.3d 50, 53 (2d Cir. 2008) (observing that, in deciding a motion to dismiss, allegations in a plaintiff's complaint must be taken as true and all reasonable inferences drawn in his favor).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. This plausibility standard "asks for more than a sheer possibility that a

---

the Sumpter Street transaction was initiated on June 3, 2015, Am. Compl. ¶ 73, and that payment was made on June 4, 2015, *id.* ¶ 77. It is unclear why Aliev would have entered into the Sumpter Street transaction after realizing that he was being duped. Several of the dates in the complaint, however, are accompanied by the modifier "on or about," so it is possible that Aliev's dates are simply imprecise.

defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" *Id.* (quoting *Twombly*, 550 U.S. at 557). In sum, if the plaintiff's complaint here fails to allege "enough facts to state a claim to relief that is plausible on its face," it must be dismissed. *See Twombly*, 550 U.S. at 570.

II.     Civil RICO Claims.

The Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, provides for a civil cause of action for treble damages for injuries sustained by any person in his business or property by reason of a defendant's "use [of] money derived from a pattern of racketeering activity to invest in an enterprise, to acquire control of an enterprise through a pattern of racketeering activity, or to conduct an enterprise through a pattern of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 495 (1985). "To establish a RICO claim, a plaintiff must show: '(1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of Section 1962.'" *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008) (quoting *DeFalco v. Bernas*, 244 F.3d 286, 305 (2d Cir. 2001)).

To claim a substantive violation of RICO, Aliev must allege: (i) that the defendant (ii) through the commission of two or more acts (iii) constituting a "pattern" (iv) of "racketeering activity" (v) directly or indirectly invests in, or maintains an interest in, or participates in (vi) an "enterprise" (vii) the activities of which affect interstate or foreign commerce. *Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir. 1983). The elements of a RICO offense must be established as to each individual defendant. *See United States v. Persico*, 832 F.2d 705, 714 (2d Cir. 1987). Subsection (c), the principal provision under which this complaint was brought, "was intended to prevent the operation of a legitimate business or union through racketeering." *Wood v. Inc. Vill.*

*of Patchogue*, 311 F. Supp. 2d 344, 355–56 (E.D.N.Y. 2004) (quoting *Mark v. J.I. Racing, Inc.*, No. 92-CV-5285 (FB), 1997 WL 40319, at *3 (E.D.N.Y. July 9, 1997)).

Courts apply the above requirements rigidly because a RICO complaint is the "litigation equivalent of a thermonuclear device." *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 656 (S.D.N.Y. 1996) (quoting *Miranda v. Ponce Fed. Bank*, 948 F.2d 41, 44 (1st Cir. 1991)). Exercising RICO jurisdiction over state-law fraud claims "with few victims and narrow impacts . . . [would] offer a remedy grossly out of proportion to any public harm." *Gross v. Waywell*, 628 F. Supp. 2d 475, 482 (S.D.N.Y. 2009). District courts thus scrutinize RICO claims at the pre-discovery stage to thwart "attempts to transform a garden variety fraud or breach of contract case into a federal RICO claim." *Holmes v. Parade Place, LLC*, No. 12 Civ. 6299 (GBD), 2013 WL 5405541, at *4 (S.D.N.Y. Sept. 26, 2013); *see also Limestone Dev. Corp. v. Vill. of Lemont*, 520 F.3d 797, 803 (7th Cir. 2008) ("RICO cases . . . are 'big' cases and the defendant should not be put to the expense of big-case discovery on the basis of a threadbare claim."). Moreover, "[g]iven the routine use of mail and wire communications in business operations, . . . 'RICO claims premised on mail or wire fraud [as is the case here] must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it.'" *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 489 (2d Cir. 2014) (quoting *Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12, 20 (1st Cir. 2000)).

In this case, several groups of defendants have moved separately to dismiss the RICO claims against them under Rule 12(b)(6). Specifically, defendants Neriya Borukhov, Stella Akbashev, Skyhigh Equities, LLC, 175-31 Jamaica, LLC, 41-21 Realty, Inc., Virgin Capital, LLC, 31 Sumpter LLC, and 84-19 Kent St Realty, LLC (hereinafter, "Neriya Borukhov Defendants"), defendants Aron Borukhov and his law firm, Aron B. Borukhov & Associates, P.C. (hereinafter, "Aron Borukhov Defendants"), and defendants Roshel Malakov and Romal Equities, LLC

(hereinafter, "Malakov Defendants"), have all moved for dismissal. They argue principally that Aliev has failed to plead adequately the existence of an enterprise, a pattern of racketeering involving particularized predicate acts, and a connection to interstate commerce. I address each argument below, treating the Defendants' motions together except where explicitly stated otherwise because their memoranda raise substantially similar arguments.

I pause to note here that one set of defendants, the Neriya Borukhov Defendants, make a particular factual argument in their motion to dismiss. The argument—which is difficult to follow—appears to be that Aliev misrepresented the 175-31 Jamaica Avenue Transaction in his complaint because, among other small discrepancies, (i) his claim that Neriya and Aron Borukhov attempted to charge him an additional $200,000 for the property is belied by the fact that a purchase price of $700,000—which was *not* to be held in escrow—was fixed in the contract; and (ii) the sale contract showed Aliev was purchasing only a 49% interest in the property. *See* Neriya Borukhov Defs.' Mem. 2–3; *see also* Malakov Defs.' Mem. 3. The Neriya Borukhov Defendants point to a contract of sale for the property that they attach to a declaration from their attorney; the Malakov Defendants also mention and attach the same contract. Gionis Decl., Exh. A; Cohen Decl., Exh. 2. Aliev vigorously disputes the veracity of that version of the contract, providing his own copy and an affirmation from his lawyer as to the inauthenticity of the Neriya Borukhov Defendants' version. Pl.'s Opp'n 5; Hallock Decl., Exhs. B, D. The defendants' versions are signed; Aliev's is not. Nevertheless, because, as described below, the complaint fails to state a cause of action under RICO even if Aliev's version of the contract is genuine, I take no position on this issue and do not consider the appended documents in deciding the motions.

A.     *Enterprise.*

i.     Generally.

The Defendants argue that Aliev has failed to allege facts necessary to establish the existence of an enterprise under RICO. *See, e.g.*, Neriya Borukhov Defs.' Mem. 7; Aron Borukhov Defs.' Mem. 5. "Enterprise" is defined by 18 U.S.C. § 1961(4) to include any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity. The Supreme Court has instructed lower courts to construe the enterprise requirement liberally. *See Boyle v. United States*, 556 U.S. 938, 944 (2009).

Nevertheless, alleging the existence of an enterprise on an association-in-fact theory—as Aliev seems to attempt here—requires identifying multiple parties that are "associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981). Specifically, this type of enterprise must have (1) a common purpose, (2) "relationships among those associated with the enterprise," and (3) enough longevity "to permit these associates to pursue the enterprise's purpose." *Boyle*, 556 U.S. at 946. The enterprise need not have a hierarchical structure or chain of command, *see id.* at 948, but it must be "an entity separate and apart from the pattern of activity in which it engages," *Turkette*, 452 U.S. at 583. Finally, with regard to a claim made under 18 U.S.C. § 1962(c), the enterprise must be distinct from the individual defendant, *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001), although a defendant may be a "RICO 'person' and one of a number of members of the RICO 'enterprise,'" *Cullen v. Margiotta*, 811 F.2d 698, 730 (2d Cir. 1987).

Although he never states as much explicitly, Aliev appears to plead an association-in-fact enterprise. *See* Am. Compl. ¶¶ 107–11. While Aliev brought suit against a number of individuals and entities, his RICO claims were brought only against Neriya and Aron Borukhov, Roshel Malakov, and Stella Akbashev, *id.* ¶¶ 153, 160, 165, 172, whom Aliev alleges formed the

enterprise in this case, *see id.* ¶ 107. The complaint, which focuses principally on the actions of Neriya and Aron Borukhov, asserts that the common purpose of the members of the enterprise was to engage in "acts of fraud and deception through formation of various corporate entities and acquiring loans, mortgages and property with money fraudulent[ly] obtained from the Plaintiff." *Id.* ¶ 110. Moreover, Aliev alleges that, through several deceptive real estate transactions over a multiyear period, Aron and Neriya Borukhov worked together for long enough to allow them to pursue the enterprise's purposes. Aliev has also made some effort to outline the "defendants' roles," *Conte v. Newsday, Inc.*, 703 F. Supp. 2d 126, 135 (E.D.N.Y. 2010), within the enterprise, alleging that Neriya served as a "confidence man," while Aron used his law firm to lend "an appearance of legitimacy" to the enterprise, Am. Compl. ¶¶ 6, 109. It would seem that an association-in-fact of at least Neriya and Aron Borukhov might be sufficiently alleged.

Nevertheless, Aliev's enterprise as pleaded may be insufficiently distinct from the defendants—the RICO "persons." The Supreme Court has held that RICO defendants must have "participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs." *Cedric Kushner Promotions, Ltd.*, 533 U.S. at 163 (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993)). There is some disagreement about whether the type of informal enterprise at issue here meets the necessary threshold. *See, e.g.*, *De Lage Landen Fin. Servs., Inc. v. Rasa Floors, LP*, No. 08-cv-00533, 2009 WL 564627, at *10 (E.D. Pa. Mar. 5, 2009) (holding that an association-in-fact is not sufficiently distinct when the parties that compose the association are also the defendants); Gregory P. Joseph, *Civil RICO: A Definitive Guide* 91 (4th ed. 2015) ("[C]an it really be said that a loose association-in-fact of a few individuals, without meaningful structure—as contemplated by *Boyle v. United States*, 556 U.S. 938 (2009)—is really distinct from those individuals? Are the individuals really conducting the *enterprise*'s affairs, not just their *own* affairs?"). Here, this is a close question. Because Aliev alleges that the Borukhovs worked

together repeatedly, he may have sufficiently pleaded an enterprise that fits within the courts' "expansive" understanding of that term. *United Food & Commercial Workers Unions & Emp'rs Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 853 (7th Cir. 2013). Nevertheless, because Aliev has failed to state a RICO claim on the pattern prong, I do not take a position as to whether he has sufficiently stated an enterprise.

> ii. As to Akbashev and the Malakov Defendants.

For purposes of the Section 1962(c) cause of action in particular, the Malakov Defendants argue that Aliev failed to adequately plead that they participated in the conduct of the enterprise. Malakov Defs.' Mem. 9. A RICO plaintiff must demonstrate that the defendants "participate[d] in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993). An enterprise may be operated or managed "not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management." *Id.* at 184. The *Reves* test may be satisfied where the defendants are "key participants" who make "critical misrepresentations" or "creat[e] false documents." *U.S. Fire Ins. Co. v. United Limousine Serv., Inc.*, 303 F. Supp. 2d 432, 453 (S.D.N.Y. 2004).

Aliev has failed to allege sufficient participation by Akbashev and the Malakov Defendants. Each party was only involved in a single allegedly fraudulent transaction. Aliev had no contact with Akbashev, Malakov, or Romal Equities, and it is not clear that any of them made any misrepresentations or acted at the direction of upper management of the enterprise. As a result, while I proceed to analyze Aliev's RICO claims against all of the Defendants below for the sake of completeness, the claims against Akbashev and the Malakov Defendants must be dismissed.

> B. *Pattern of Racketeering*.

The Defendants next maintain that the complaint does not establish a pattern of racketeering. *See, e.g.*, Neriya Borukhov Defs.' Mem. 10–13; Aron Borukhov Defs.' Mem. 5–7.

"Under any prong of § 1962," a plaintiff in a RICO suit must establish such a pattern. *GICC Capital Corp. v. Tech. Fin. Grp., Inc.*, 67 F.3d 463, 465 (2d Cir. 1995). A pattern of racketeering exists where (i) a defendant commits two or more predicate acts that (ii) are related and (iii) that amount to or pose a threat of continued criminal activity. *See H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989). This requirement "prevent[s] the application of RICO to isolated or sporadic criminal acts." *Cosmos Forms Ltd. v. Guardian Life Ins. Co. of Am.*, 113 F.3d 308, 310 (2d Cir. 1997). I consider each of the relevant sub-requirements below.

    i.  Two Predicate Acts.

    A pattern of racketeering requires "at least two acts of racketeering activity, . . . the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). Section 1961(1) of the RICO statute defines "racketeering activity" as certain criminal acts under state and federal law. Aliev alleges that the Defendants engaged in three of those predicate acts: mail fraud, 18 U.S.C. § 1341, wire fraud, 18 U.S.C. § 1343, and money laundering, 18 U.S.C. §§ 1956, 1957. *See* Am. Compl. ¶¶ 116–20. He also alleges that they engaged in a number of criminal acts under state law, *see id.* ¶ 112, and that they violated certain provisions of the federal Real Estate Settlement Procedures Act; none of these latter violations, however, fit within the categories of RICO predicates enumerated by 18 U.S.C. § 1961(1).

    a.  Mail Fraud.

    A complaint alleging mail (or wire) fraud must show: (i) the existence of a scheme to defraud, (ii) the defendant's knowing or intentional participation in the scheme, and (iii) the use of interstate mails or wires in furtherance of the scheme. *S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.*, 84 F.3d 629, 634 (2d Cir. 1996); *see also id.* ("[A complaint stating a RICO claim based on predicate acts of mail or wire fraud] must allege facts that give rise to a strong inference of fraudulent intent."). "The gravamen of the offense is the scheme to defraud, and any 'mailing

that is incident to an essential part of the scheme satisfies the mailing element,' even if the mailing itself 'contain[s] no false information.'" *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647 (2008) (quoting *Schmuck v. United States*, 489 U.S. 705, 712 (1989)). Moreover, to establish the use of the mails in furtherance of the scheme, a plaintiff must show only that the defendants acted with knowledge that the use of the mails would follow in the ordinary course of business or that such use was otherwise reasonably foreseeable under the circumstances. *United States v. Tocco*, 135 F.3d 116, 124 (2d Cir. 1998). As a result, "it is not significant for purposes of the mail fraud statute that a third-party, rather than the defendant, wrote and sent the letter at issue." *United States v. Bortnovsky*, 879 F.2d 30, 36 (2d Cir. 1989).

For pleading purposes, where a plaintiff alleges that a defendant has committed a predicate act sounding in fraud, such as mail fraud, the plaintiff must satisfy Fed. R. Civ. P. 9(b)'s requirement that the circumstances constituting fraud be stated "with particularity." *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 119 (2d Cir. 2013). A claim of mail fraud must thus typically specify the content, date, and place of any misrepresentations, and the identity of the persons making them. *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172–73 (2d Cir. 1990); *see also Anatian v. Coutts Bank (Switzerland) Ltd.*, 193 F.3d 85, 88 (2d Cir. 1999). Where there are multiple defendants, the plaintiff must allege facts specifying each defendant's contribution to the fraud. *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987).

Here, Aliev has alleged multiple acts of mail fraud. Specifically, Aliev contends that on November 23, 2012, Neriya and Aron Borukhov and Stella Akbashev caused the mailing—by Aliev—of a certified check in the amount of $200,000 in furtherance of their alleged scheme to defraud him. Am. Compl. ¶ 70. Moreover, on May 26, 2015 and on September 3, 2015, Neriya and Aron Borukhov and Roshel Malakov allegedly used the mails to record property deeds

arguably in furtherance of the same scheme. *Id.* ¶ 49.[5] It is evident that at least the first act of mail fraud was essential to the fraudulent scheme. It is likewise evident from the pleadings that these defendants either intended or could have reasonably foreseen that the use of the mails would follow from their actions. Moreover, Aliev has succeeded in pleading the content, date, time, and speaker associated with the aforementioned three purported acts of mail fraud.

Nevertheless, Aliev has not sufficiently alleged at least two predicate acts of mail fraud. This is because the 2015 mailings cannot be said to be "in furtherance of" the scheme to defraud. Those mailings deal with the Jamaica Avenue property, which Aliev admits he knew he was not going to acquire as of December 2013 when the Borukhovs told him the price had gone up. *Id.* ¶¶ 29–31. As a result, by the time the Borukhovs and Malakov were recording the deeds in 2015 to mark the admittedly odd exchange of title that had occurred in August 2014, Aliev no longer had an interest in the property. *See* Malakov Defs.' Mem. 1, 14. Aliev complains that the Defendants delayed recording the deed to prevent putting Aliev on notice of the transaction, Pl.'s Opp'n 9–10, an argument that does not survive scrutiny. Moreover, even if one accepted that argument, the recording of the deeds would seem to undermine the scheme to defraud rather than further it. *See Lundy*, 711 F.3d at 119–20 ("[T]he mailing of pay stubs cannot further the fraudulent scheme because the pay stubs would have revealed (not concealed) [the scheme]."). At the very least, Aliev has failed to allege with particularity how the 2015 mailings could be considered incidental to an essential part of the Defendants' scheme. As a result, all that is left is a single properly alleged instance of mail fraud from November 2012.

---

[5] Aliev also claims that Neriya Borukhov engaged in mail fraud in mailing, on September 1, 2015, an application for a permit to conduct construction on one of the properties at issue. Am. Compl. ¶¶ 44, 46. This cannot constitute a predicate act, however, because it was not a part of the scheme to defraud Aliev as outlined in the complaint.

b.       Wire Fraud.

Aliev also makes several allegations of wire fraud in his complaint.  *See* Am. Compl. ¶¶ 47, 51, 71, 83, 94.  A claim of wire fraud must meet the same requirements as a claim of mail fraud, *see S.Q.K.F.C., Inc.*, 84 F.3d at 634, but must additionally involve a use of transmission facilities, such as a telephone or wire, that actually crosses interstate lines, *see Bernstein v. Misk*, 948 F. Supp. 228, 239 (E.D.N.Y. 1997); *see also Smith v. Ayres*, 845 F.2d 1360, 1366 (5th Cir. 1988) ("[P]urely intrastate communication [is] beyond the [wire fraud] statute's reach.").  While most of Aliev's assertions of wire fraud fail for other reasons as well—such as a failure to plead use of a wire at all, *see, e.g.*, Am. Compl. ¶¶ 47, 51, 71—each allegation fails to state a claim because Aliev does not assert that any use of the wires crossed state boundaries.  Indeed, "[w]here all parties are New York residents," as is the case here, some courts have held that "all telephone calls are presumed to be intrastate and, absent any indication otherwise, the predicate act of wire fraud is not stated."  *McCoy v. Goldberg*, 748 F. Supp. 146, 154 (S.D.N.Y. 1990).  Aliev makes no allegations regarding interstate use of the telephone, Internet, or wire service.  As a result, Aliev's claim that wire fraud constitutes a RICO predicate act in this case must fail.

c.       Money Laundering.

"A plaintiff seeking to maintain a money laundering claim must allege: '(1) that the defendant conducted a financial transaction; (2) that the transaction in fact involved the proceeds of specified unlawful activity as defined in [18 U.S.C.] § 1956(c)(7); (3) that the defendant knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity; and (4) that the defendant knew that the financial transaction was designed in whole or in part to conceal or disguise the source, ownership, control, etc. of those proceeds.'" *Leung v. Law*, 387 F. Supp. 2d 105, 118 (E.D.N.Y. 2005) (alteration in original) (quoting *United States v. Maher*, 108 F.3d 1513, 1527–28 (2d Cir. 1997)).  The underlying "unlawful activity"

alleged to make out a violation of Section 1956 or 1957 must be distinct from the act of money laundering itself. *See United States v. Szur*, 289 F.3d 200, 213–14 (2d Cir. 2002).

Aliev's pleading of the money-laundering predicate is not subject to Fed. R. Civ. P. 9(b)'s particularity requirement. *Leung*, 387 F. Supp. 2d at 118. At the same time, "[w]hile a plaintiff need not allege money laundering with great particularity, [he] must plead all elements of the offense." *Casio Comput. Co. v. Sayo*, No. 98-cv-3772 (WK), 2000 WL 1877516, at *16 (E.D.N.Y. Oct. 13, 2000). Although Aliev lists money laundering as a "RICO Predicated Offense[]" in his complaint, Am. Compl. ¶¶ 116, 120, he makes no further allegations to connect any of the facts presented to the money-laundering causes of action. Indeed, in his opposition to the motions to dismiss, he fails to mention money laundering when summarizing the alleged predicate acts. *See* Pl.'s Opp'n 20 (observing that he "[a]lleged in detail that the Defendants engaged in acts of Wire Fraud, Mail Fraud, Conspiracy, and State crimes . . ."). Substantively, his wire fraud claims fail, and the only act of mail fraud that could be said to have produced any proceeds was the mailing of $200,000 to JPMorgan Chase, *see* Am. Compl. ¶ 61, which Aliev alleges was put toward a payment of a mortgage for a different property from the one in which he believed he was investing, *id.* ¶ 65. With regard to that transaction, Aliev makes no allegations outside of the boilerplate language he employs in his list of RICO predicates that the Defendants engaged in it in order to conceal the source or ownership of the proceeds. As a result, his claim of money laundering as a predicate act should be disregarded for purposes of the pattern of racketeering analysis below.

The failure to plead at least two predicate acts compels the dismissal of Aliev's RICO claims. Nevertheless, on the possibility that Aliev may subsequently state at least two such acts, I continue my pattern analysis below. I note here again, however, that the claims must be dismissed as to Akbashev and Malakov. As to Akbashev there are no particularized allegations that she engaged in any predicate acts. As to Malakov, the only predicate acts that could be sufficiently

alleged are the 2015 mailings. Even if these were adequately pleaded as instances of mail fraud, "multiple acts of mail fraud in furtherance of a single episode of fraud involving one victim and relating to one basic transaction cannot constitute the necessary pattern." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 489 (2d Cir. 2014) (quoting *Tellis v. U.S. Fid. & Guar. Co.*, 826 F.2d 477, 478 (7th Cir. 1986)).

### ii. Relatedness.

Again, a pattern of racketeering exists where (i) a defendant commits two or more predicate acts that (ii) are related and (iii) that amount to or pose a threat of continued criminal activity. *See H.J. Inc.*, 492 U.S. at 239. Predicate acts are related where they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 240 (quoting 18 U.S.C. § 3575(e) (1982) (repealed 1987)). In this circuit, "predicate acts 'must be related to each other ("horizontal" relatedness), and they must be related to the enterprise ("vertical" relatedness).'" *United States v. Daidone*, 471 F.3d 371, 375 (2d Cir. 2006) (quoting *United States v. Minicone*, 960 F.2d 1099, 1106 (2d Cir. 1992)). A predicate act is related to the enterprise if "the offense related to the activities of the enterprise." *United States v. Burden*, 600 F.3d 204, 216 (2d Cir. 2010). Relatedness is rarely the focus of a court's analysis under the pattern prong in a civil RICO case.

If credited, the aforementioned acts of mail fraud alleged by Aliev are related. They were purportedly motivated by the same purpose, had the same results, and involve the same victim. Moreover, they are related to the enterprise because they constituted the activities of the enterprise.

### iii. Continuity.

A plaintiff must also demonstrate that the predicate acts "amount to, or . . . otherwise constitute a threat of, *continuing* racketeering activity." *H.J. Inc.*, 492 U.S. at 240. Continuity is "centrally a temporal concept" that "is both a closed- and open-ended concept, referring either to

a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241–42. Before I evaluate these two types of continuity below, I note again that "[t]he Court has a duty to critically assess RICO claims at the threshold, to assure that a plaintiff's claim of a RICO violation is not used improperly as a club to bludgeon settlement or surrender without reciting legally sufficient allegations." *Kalimantano GmbH v. Motion in Time, Inc.*, 939 F. Supp. 2d 392, 407 (S.D.N.Y. 2013). Moreover, where the only predicate acts alleged by a complaint are mail or wire fraud, "these acts . . . are generally considered to carry less weight in showing a RICO pattern, in part because a predicate use of the mails or wires need not be itself illegal." *Allen ex rel. Allen v. Devine*, 726 F. Supp. 2d 240, 250 (E.D.N.Y. 2010).

### a. Closed-Ended Continuity.

Closed-ended continuity requires a "series of related predicates extending over a substantial period of time." *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 184 (2d Cir. 2008) (quoting *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999)). Since the Supreme Court decided *H.J. Inc.*, the Second Circuit has "never held a period of less than two years to constitute a 'substantial period of time.'" *Id.* (quoting *Cofacredit*, 187 F.3d at 242). "[W]hile two years may be the *minimum* duration necessary . . . , the mere fact that predicate acts span two years is insufficient, without more, to support a finding of a closed-ended pattern." *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 181 (2d Cir. 2004). The relevant period of time for evaluating continuity is "the time during which RICO predicate activity occurred, not the time during which the underlying scheme operated." *Spool*, 520 F.3d at 184. Beyond duration, the Second Circuit has identified several other "non-dispositive factors" for a court to consider in determining whether closed-ended continuity exists, "including, *inter alia*, . . . the number and variety of acts, the number of participants, the number of victims, and the presence of separate schemes." *GICC Capital Corp.*, 67 F.3d at 467; *see also Mathon v. Marine*

*Midland Bank, N.A.*, 875 F. Supp. 986, 998 (E.D.N.Y. 1995) (finding no such continuity where the case "involves a single transaction involving one alleged victim . . . a limited goal, no threatened future action, and no allegation of long-term criminal conduct"); *Acme Am. Repairs, Inc. v. Katzenberg*, No. 03-CV-4740 (RRM), 2010 WL 3835879, at *7 (E.D.N.Y. Sept. 24, 2010).

Aliev fails to state facts sufficient to find closed-ended continuity. While the alleged scheme lasted from approximately November 2012 through September 2015, nearly three years in duration, it involved only a handful of predicate acts over those three years—at most, one per year. Moreover, it involved only a single victim,[6] the same fairly simple scheme as to each transaction, and, for the most part, the same two perpetrators. The predicate acts in this case were thus "isolated" and "sporadic." *H.J. Inc.*, 492 U.S. at 239 (quoting RICO's legislative history).

        b.        Open-Ended Continuity.

The threshold question for purposes of an open-ended continuity analysis is whether a defendant has engaged in "an inherently unlawful act" for the benefit of "an enterprise whose business is racketeering activity"; if so, the threat of future criminal activity required to establish continuity is presumed. *GICC Capital Corp.*, 67 F.3d at 466; *see also United States v. Cain*, 671 F.3d 271, 288 (2d Cir. 2012). Where an enterprise primarily conducts a legitimate business, however, "there must be some evidence from which it may be inferred that the predicate acts were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity." *Cofacredit, S.A.*, 187 F.3d at 243. "Fraud[] in the sale of property" has been specifically labeled as an activity that is not "inherently unlawful."

---

[6] Aliev alleges that there may have been more victims of the Borukhovs' scheme. Pl.'s Opp'n 1. For instance, he contends that they "stole and misappropriated funds in the sum of $429,614.92 from an individual known as Maxim Fuzailov," who subsequently sued them in New York State Supreme Court. Am. Comp. ¶ 9. Aliev fails to provide details and it is not apparent from Fuzailov's complaint whether the Borukhovs' dealings with him involved any RICO predicate acts. *See* Hallock Decl., Exh. I. Even accounting for Fuzailov, however, the small number of victims still weighs against finding continuity.

*United States v. Aulicino*, 44 F.3d 1102, 1111 (2d Cir. 1995). Where the racketeering activity is associated with a business that is not inherently unlawful, "courts generally have found no threat of continuing criminal activity arising from [the nature of the] conduct that extended over even long[ ] periods." *Id.* Moreover, courts have pointed to schemes that are "inherently terminable," such as the looting of a corporation's limited assets, as prime examples of alleged racketeering patterns that fail the open-ended continuity test. *GICC Capital Corp.*, 67 F.3d at 466.

Aliev's complaint fails to allege open-ended continuity. While an enterprise engaged in otherwise legitimate business could be involved in racketeering activity sufficient to establish open-ended continuity, it takes some evidence to reach that threshold. Here, Aliev admits that the Borukhovs involved him in at least one legitimate business transaction. *See* Am. Compl. ¶¶ 19–20. According to the complaint, they proceeded to defraud him in the context of four subsequent real estate transactions. Although one might conclude that the Borukhovs are likely to continue to engage in questionable business tactics, and even in fraud, the existence of a mere handful of RICO predicate acts—at most—does not suggest that mail or wire fraud was the regular way of operating their business. *Cf. SKS Constructors, Inc. v. Drinkwine*, 458 F. Supp. 2d 68, 80 (E.D.N.Y. 2006) (finding sufficient allegations of open-ended continuity where "the predicate acts are the *only* way in which [an otherwise legitimate] business operated" (emphasis added)).

Indeed, the predicate acts were spread out over four transactions, suggesting that they were not integral to the way the Borukhovs conducted business. *See Kalimantano GmbH*, 939 F. Supp. 2d at 407 ("[W]ithout more, four fraudulent transactions are an insufficient basis on which to assert that . . . [a] business model is based on [fraud]."). Moreover, the nature of the predicate acts— mail fraud, as opposed to, for example, more egregious predicate acts such as extortion or murder—does not inherently imply a threat of continued criminal activity. Indeed, "[i]t will be the unusual fraud that does not enlist the mails and wires in its service at least twice." *Al-Abood*

*ex rel. Al-Abood v. El-Shamari*, 217 F.3d 225, 238 (4th Cir. 2000) (quoting *Anderson v. Found. for Advancement, Educ. & Emp't of Am. Indians*, 155 F.3d 500, 506 (4th Cir. 1998)). If a mere handful of predicate acts of mail fraud could be said to state a case of open-ended continuity, it is hard to imagine a scenario in which a complaint would ever state at least two predicates, but fail the open-ended continuity test. *See D.R.S. Trading Co. v. Fisher*, No. 01 CIV 8028 (WHP), 2002 WL 1482764, at *4 (S.D.N.Y. July 10, 2002) ("When the fraudulent conduct alleged involves such a limited number of perpetrators, small number of victims, and limited goal, it cannot support a claim of open-ended or closed-ended continuity."). The narrow scope of fraudulent activity here fails to suggest a "distinct threat of long-term racketeering activity." *H.J. Inc.*, 492 U.S. at 242.

Aliev has thus failed to plead sufficiently the existence of a pattern of racketeering under existing law as outlined above. Nevertheless, I note here that he has also failed to plead a pattern under the more functional, less mechanistic approach to interpreting the pattern requirement that certain courts have adopted. Judge Marrero's opinion in *Gross v. Waywell*, 628 F. Supp. 2d 475 (S.D.N.Y. 2009), provides a useful example of this approach. In that case, Judge Marrero interprets the pattern requirement, and its sub-requirement of continuity, with an eye to the purpose of RICO. He observes that "plaintiffs have overreached well beyond the bounds of the law's reasonable construction and fair-game litigation." *Id.* at 480. In his reading of the statute and its history, "the act sought to strike at criminal conduct characterized" by certain "consequential dimensions"; specifically, "[t]he offenses must be of a degree sufficiently serious not only to inflict injury upon [their] immediate private victims, but also to cause harm to significant public processes or institutions, or otherwise pose threats to larger societal interests worthy of [the statute's] severe punitive and deterrent purposes." *Id.* at 481. The civil cause of action serves to "encourag[e] and enlist[] the . . . litigation services of 'private attorneys general.'" *Id.* (quoting *Agency Holding Corp. v. Malley-Duff & Assocs.*, 483 U.S. 143, 151 (1987)). He continues:

> By filing actions in federal courts that fall short of RICO's substantive threshold, plaintiffs often seek the courts' exercise of federal jurisdiction over litigation that more properly falls within the province of state law remedies. Exercise of federal court jurisdiction in such cases, especially those that rely on nothing more than incidental use of the mails or wires in furtherance of a simple fraudulent scheme with few victims and narrow impacts, would threaten to federalize garden-variety state common law claims, and offer a remedy grossly out of proportion to any public harm or larger societal interests associated with localized wrongful conduct ordinarily involved in such actions.

*Id.* at 482. Judge Marrero's approach is not inconsistent with current law; it might find a place, for instance, under the analysis of the closed-ended continuity factors described above. *See, e.g.*, *Acme Am. Repairs, Inc.*, 2010 WL 3835879, at *8 ("Although deplorable, this conventional corporate swindle is not intended to fall within the ambit of the federal RICO statute."). At bottom, like *Gross*, this case does not fall within the class of cases for which Congress intended to authorize via the RICO statute federal jurisdiction and the boon of amplified damages that go along with it.

C. *Interstate Commerce.*

While Aliev's complaint must be dismissed on the basis of a failure to plead a pattern of racketeering, I nevertheless continue to address a number of remaining arguments regarding his claims. All of RICO's subsections require an enterprise "which is engaged in, or the activities of which affect, interstate or foreign commerce." *See* 18 U.S.C. § 1962(a)–(c). The interstate commerce prong is RICO's "jurisdictional element." *United States v. Barton*, 647 F.2d 224, 233 (2d Cir. 1981). Nevertheless, "[t]he law in this Circuit does not require RICO plaintiffs to show more than a minimal effect on interstate commerce." *DeFalco v. Bernas*, 244 F.3d 286, 309 (2d Cir. 2001). Even a minimal showing, however, requires some factual allegations of a nexus with interstate commerce. *See Moore v. Guesno*, 485 F. Supp. 2d 300, 309 (W.D.N.Y. 2007). The Defendants allege that Aliev's complaint fails to provide a sufficient nexus to interstate commerce. *See, e.g.*, Aron Borukhov Defs' Mem. 7; Malakov Defs.' Mem. 16. Indeed, Aliev does fail to plead a connection to interstate commerce; the parties are all residents of New York and all of the

property at issue is located in New York. In his opposition to the motions to dismiss, however, Aliev asserts that the enterprise affects interstate commerce "through [the] value of the property, ability of various parties to transact business and taxation in NY." Pl.'s Opp'n 21.

Some courts in this circuit have suggested that use of the mails, an instrumentality of interstate commerce, could be sufficient to meet the low threshold. *See, e.g.*, *Cadle Co. v. Flanagan*, 271 F. Supp. 2d 379, 389–90 (D. Conn. 2003). Others have suggested that being "left with less money to spend on items involved in interstate commerce" as a result of the activities of an enterprise might itself be a sufficient nexus, at least to support certain alleged predicate acts. *See, e.g.*, *Jund v. Town of Hempstead*, 941 F.2d 1271, 1285 (2d Cir. 1991) (rejecting challenge to jury's finding that a predicate Hobbs Act violation sufficiently affected interstate commerce based on this loss-of-money rationale). *But see Calabrese v. CSC Holdings, Inc.*, 283 F. Supp. 2d 797, 810 (E.D.N.Y. 2003) ("The Court has found no case that applied the depletion of assets theory [to establish a sufficient nexus with interstate commerce for a predicate Hobbs Act violation] in a case involving *individual* victims." (emphasis added)). Although the standard is a "de minimis" one, *First Capital Asset Mgmt., Inc.*, 385 F.3d at 173 n.12, even in a Hobbs Act case involving the depletion-of-assets theory, "[t]he victim's purchase of interstate goods . . . must be of a continuing nature or the relationship between the extortion and any interstate commerce becomes merely conjectural." *United States v. Merolla*, 523 F.2d 51, 54 (2d Cir. 1975). The present case does not involve a Hobbs Act predicate. Moreover, the complaint contains no allegations regarding the effect that the predicate acts would have on interstate commerce, and the vague allegations in Aliev's opposition are not sufficient to establish that the "activities" of the alleged enterprise "affect" interstate commerce. 18 U.S.C. § 1962(a)–(c).

D.    *Causation.*

To state a claim under civil RICO, a plaintiff is required to show that he was injured "by reason of" a RICO violation. 18 U.S.C. § 1964(c). In order to survive a motion to dismiss, the plaintiff must thus allege that the defendant's violation of the statute was both the proximate and the "but for," or factual, cause of his injuries. *Holmes v. Secs. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992). "[T]he RICO pattern or acts proximately cause a plaintiff's injury if they are a substantial factor in the sequence of responsible causation, and if the injury is reasonably foreseeable or anticipated as a natural consequence." *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23–24 (2d Cir. 1990). "[T]he reasonably foreseeable victims of a RICO violation are the targets, competitors and intended victims of the racketeering enterprise." *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 124 (2d Cir. 2003) (Sotomayor, J.).

Aliev has likely sufficiently alleged causation as to the Borukhovs. While "RICO provides a civil remedy only to those persons injured 'by reason of' the defendant's *predicate acts*," *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2d Cir. 1994) (emphasis added), at least one of the predicate acts—the alleged mail fraud involving the mailing of $200,000 in certified checks—directly resulted in injury to Aliev, and the other alleged predicates arguably constituted substantial factors in Aliev's losses. While much of the Defendants' misleading conduct described in the complaint, including the multiple in-person meetings set up by the Borukhovs, did not constitute a predicate act or acts, pleading the acts of mail fraud is likely sufficient to permit an inference of causation. The Malakov Defendants, however, argue that their actions could not have caused Aliev's injury because Aliev admits to having assented to Aron and Neriya Borukhov taking the money Aliev had given them for the Jamaica Avenue property and putting it toward the Dieterle Crescent property. Malakov Defs.' Mem. 7–8. While it is not clear that Aliev did explicitly agree to this change in plans, he did not object until many years later—

via this lawsuit. The chain of causation between the Malakov Defendants' later involvement with the Jamaica Avenue property and Aliev's injury from that transaction is thus broken, as a result of which causation provides another basis for dismissal as to the Malakov Defendants.

E.     *RICO Subsections—Other Requirements.*

The failure to plead a pattern of racketeering activity is fatal to Aliev's claims under 18 U.S.C. § 1962(a)–(c). It is under 18 U.S.C. § 1962(c), the subsection that outlaws participation in an enterprise through a pattern of racketeering activity, that the complaint principally states a claim. Nevertheless, I address arguments regarding subsections (a) and (b) further below.

Even if Aliev had adequately pleaded a pattern of racketeering activity, his claim under 18 U.S.C § 1962(a) would still fail because he has not alleged an injury stemming from the "use or invest[ment]" of racketeering income. *See Ouaknine v. MacFarlane*, 897 F.2d 75, 83 (2d Cir. 1990) (holding that, to state a claim under Section 1962(a), a plaintiff must allege injury stemming from the investment of racketeering income itself, not solely from the predicate acts). "Courts have repeatedly held that the injury causation requirement of § 1962(a) is not satisfied by allegations that a defendant, which is also the enterprise, invested the racketeering income in its general operations, thereby permitting it to continue its pattern of racketeering." *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 657 (S.D.N.Y. 1996). Moreover, the money Aliev invested was "apparently used to purchase real property, not to acquire or maintain an interest in the alleged enterprise." *Bernstein v. Misk*, 948 F. Supp. 228, 241 (E.D.N.Y. 1997).

Aliev's claim under 18 U.S.C. § 1962(b) would fail as well even if he had appropriately alleged a pattern of racketeering activity. That section makes it unlawful to acquire or maintain an interest in an enterprise through a pattern of racketeering activity. Aliev does not allege any facts to support the claim that the Borukhovs acquired an interest in the purported enterprise through acts of racketeering. Moreover, Aliev has not been injured by reason of any purported

acquisition of an interest in the enterprise. *See U.S. Fire Ins. Co. v. United Limousine Serv., Inc.*, 303 F. Supp. 2d 432, 450 (S.D.N.Y. 2004). "The purpose of Section 1962(b) is 'to prohibit the takeover of a legitimate business' through racketeering." *Breslin Realty Dev. Corp. v. Schackner*, 397 F. Supp. 2d 390, 399 (E.D.N.Y. 2005) (quoting *Wood v. Inc. Vill. of Patchogue*, 311 F. Supp. 2d 344, 355 (E.D.N.Y. 2004)). Such a provision clearly does not apply here.

Finally, where a plaintiff has failed to "state a cause of action for substantive violations of RICO," a claim based on 18 U.S.C. § 1962(d), which Aliev also alleges, "does not set forth a conspiracy to commit such violations." *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1064 (2d Cir. 1996), *vacated on other grounds by NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128 (1998).

F.     *State-Law Claims*.

A district court has supplemental jurisdiction over state-law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). Nevertheless, supplemental jurisdiction may be declined when, among other circumstances, "the district court has dismissed all claims over which it has original jurisdiction." *Id.* § 1367(c)(3). Taking into consideration the values of judicial economy, convenience, fairness, and comity, *see Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 349–50 (1988), I decline to exercise supplemental jurisdiction over Aliev's state-law claims. Those claims are dismissed without prejudice.

## CONCLUSION

The motions to dismiss the complaint are granted. I grant the plaintiff leave to replead within thirty (30) days of the date of this order.

**SO ORDERED.**

Brooklyn, New York
July 8, 2016

*Edward R. Korman*
Edward R. Korman
United States District Judge